**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION**

| | | |
|---|---|---|
| Occupy Columbia; Walid Hakim; | ) | C/A NO. 3:11-cv-03253-CMC |
| Melissa Harmon; Bradley Powell; | ) | |
| Timothy Liszewski; David Bland; | ) | **MEMORANDUM OPINION** |
| Ashley Blewer; and David Arroyo, | ) | **ON PLAINTIFFS'** |
| | ) | **MOTION FOR** |
| Plaintiffs, | ) | **PRELIMINARY INJUNCTION** |
| | ) | |
| v. | ) | |
| | ) | |
| Nikki Haley, Governor of South Carolina; | ) | |
| State of South Carolina; Leroy Smith, | ) | |
| Director of the South Carolina Department | ) | |
| of Public Safety; Zachery Wise, Chief of | ) | |
| of the South Carolina Bureau of Protective | ) | |
| Services; Nikki Haley, Chairwoman of the | ) | |
| South Carolina Budget & Control Board; | ) | |
| Harvey S. Peeler, Jr., Chairman of the | ) | |
| South Carolina State House Committee; | ) | |
| M. Richbourg Roberson, Division of | ) | |
| General Services; Sterling L. Morrison, | ) | |
| Division of General Services; Curtis | ) | |
| Loftis, State Treasurer; Richard Eckstrom, | ) | |
| Comptroller General; Hugh Leatherman, | ) | |
| Senate Finance Committee; Brian White, | ) | |
| House Ways and Means Committee; James | ) | |
| Carr; Joe Hodge; Andrew Schmidt; and | ) | |
| Marvin Harris, III, | ) | |
| | ) | |
| Defendants. | ) | |

This matter came before the court on December 14, 2011, for oral argument on Plaintiffs'

motion for preliminary injunction to enjoin Defendants from interfering with Plaintiffs' 24-hour

occupation of the State House grounds, including sleeping on the State House grounds, and the use

of sleeping bags and tents. By order entered that same day, the court granted Plaintiffs' motion and

indicated that it would issue a separate memorandum opinion setting forth its reasons for the

decision no later than December 19, 2011. The court now issues its supporting memorandum opinion.

## BACKGROUND

Plaintiff Occupy Columbia is part of the Occupy Movement that began with Occupy Wall Street in Manhattan's Financial District on September 17, 2011. Occupy Columbia was organized in early October 2011, and protestors began occupying the State House grounds on October 15, 2011.[1] According to Plaintiffs:

> Occupy Columbia is now an established occupation located on the State House grounds. Like the other Occupy protests in other locations across the country, literal occupation of the State House grounds 24 hours a day is a core component of the Occupy Columbia movement and a key message that the Occupy Columbia protestors seek to communicate to the government and to the world. "Around the clock" is not merely a symbol, but functions as an exemplar to the community demonstrating the protestors' vision of a more just and equal society. Physically occupying the State House grounds, including sleeping overnight on the grounds, is the only effective manner in which Occupy Columbia members can express their message of taking back our state to create a more just, economically egalitarian society.

Dkt. No. 1-1 at 15. Occupy Columbia alleges that it is a peaceful movement and that the occupation of the State House grounds has caused no damage to the property. The group alleges that it keeps the sidewalks clear of clutter, uses a portable bathroom or the public bathroom at the State House, and does not cook on the grounds. *Id.* at 14. Further, the group alleges it has developed a security committee to ensure that protestors and their belongings are safe and secure during the night. *Id.* The group also alleges that it works with the horticulturist who maintains the grounds to minimize

---

[1] Occupy members remained on the State House grounds 24 hours a day, utilizing tarps (but not tents) and sleeping bags.

its impact on the lawn and with the Bureau of Protective Services ("BPS"),[2] the law enforcement and security force for the State House grounds, in an effort to maintain a peaceful protest. Dkt. No. 1-7 at 3.

During the first week of the occupation, Plaintiff Timothy Liszewski, Occupy Columbia's Police Liaison, approached the Division of General Services ("General Services") to determine whether the group needed a permit. Dkt. No. 1-7 at 3 (Liszewski Affidavit). General Services is a division of the State Budget and Control Board ("Board") and provides a variety of services, including facilities management, to the state. According to Mr. Liszewski, an employee of General Services stated that the group would need a permit, especially if the group intended to use the electrical outlets on the Gervais Street side of the Capitol. The General Services' employee

---

[2] According to the South Carolina Department of Public Safety, the Bureau of Protective Services (BPS) Department was formed in 1994.

> Prior to 1994, this Department was named the South Carolina Capitol Police and operated under the State Law Enforcement Division (SLED). It is one of three accredited state police agencies functioning under the South Carolina Department of Public Safety. The South Carolina Highway Patrol Division and the State Transport Police Division are the other two.

> BPS provided [sic] comprehensive law enforcement, public safety and security services for state employees and more than 220,000 annual visitors to the Capitol Complex. This includes members of the State Legislature, the Governor, Lieutenant Governor and their families. The Capitol Complex area includes the State Capitol Building, Gressette Building (Senate offices), Solomon Blatt Building (Congressional offices), Wade Hampton Building, Calhoun Building (Court of Appeals), Brown Building, Dennis Building, Department of Transportation, Rutledge Building (Department of Education), South Carolina State Library and the State Supreme Court.

http://www.scdps.org/bps/who_we_are.asp (last accessed on December 15, 2012). A copy of this web page is attached to this Opinion.

provided a copy of a two-page document entitled "Conditions for Use of South Carolina State House and Grounds" ("Conditions").[3]   Paragraph 8 of the Conditions provides:

> All activities on the grounds or in the State House must strictly adhere to the times as scheduled to insure that the activities will not conflict with any other scheduled activities.  Activities will not be scheduled beyond 5:00 p.m. in the State House and 6:00 p.m. on the grounds unless special provisions in writing have been made to extend the time.

Dkt. No. 1-5 at 29 ("6:00 p.m. policy").  Plaintiff Liszweski allegedly asked the General Services' employee if the group "could have open-ended permission to stay on the grounds beyond 6 p.m." and "she said probably not."[4]  Dkt. No. 1-7 at 4.  Plaintiffs believe that "no application for a permit is available on any public source such as the internet or at the front counter of the Division of General Services."  Dkt. No. 1-1 at 19.  Defendants confirm that there is no licensing or permit process for use of the State House grounds.[5]  Dkt. Nos. 13 at 8-9; 13-1 at 4 (Griffin Affidavit).

Although "special provisions in writing" to extend the 6:00 p.m. limitation have not been received by Occupy Columbia, the group alleges it received permission from the Budget and Control Board's State House and Grounds Committee to sleep under a portico on the Gervais Street side of

---

[3]  A copy of the Conditions is attached to this Opinion.

[4]  Mr. Liszweski alleges that he spoke with Carla Griffin, the Deputy Director of General Services.  Dkt. No. 1-7 at 3-4.  Carla Griffin affirmed that she remembers meeting Mr. Liszweski but does not "remember the exact words of the conversation."  Dkt. No. 13-1 at 3.  She also affirmed, "No one has ever requested to camp continuously on State House grounds, so if he had asked for 'open-ended permission to stay on the grounds,' I would have informed him of the 'Conditions of Use of South Carolina State House and Grounds' and requested greater detail about his request.  I certainly would not have authorized a request to camp continuously on State House grounds."  *Id.*

[5]  Board Defendants admit that the State Budget and Control Board has no permit requirements for organizations seeking use of the State House grounds.  In fact, Board Defendants describe General Services' role in authorizing the use of the State House grounds as "an entity that takes reservations."  Dkt. No. 13 at 9.

the State House when there is inclement weather.  Dkt. No. 1-7 at 4.  The group alleges it has agreed to leave the portico by 8:00 a.m. when the portico is used.  *Id.*

At 4:00 p.m. on November 16, 2011, over a month after the occupation began, Governor Haley announced in a press conference that Plaintiffs were required to leave the State House grounds every night by 6:00 p.m. and could return at 6:00 a.m. every morning.  Dkt. No. 1-5 at 5.  On the same date, Governor Haley sent a letter to the Interim Director of the Department of Public Safety ("DPS") and the Chief of Police of BPS requesting assistance "in removing any individual associated with the 'Occupy Columbia' group, as well as his or her belongings, who remains on Statehouse grounds after 6:00 p.m. without written authorization from the Budget and Control Board."  Dkt. No. 1-2 at 3.  At 6:15 p.m., after allegedly removing their belongings from the State House grounds,[6] nineteen Occupy protestors "gathered arm-in-arm" on the paved area at the foot of the Confederate battle flag on the State House grounds.  Dkt. No. 1-5 at 18 (Hakim Affidavit).  There is no indication that the nineteen protestors were impeding foot traffic on the State House grounds during this time.  At approximately 6:30 p.m., the nineteen protestors were arrested by BPS officers and taken to the Alvin S. Glenn Detention Center.  All nineteen were charged with trespassing in violation of either S.C. Code Ann. § 10-11-20 or § 10-11-30.[7]  All were released on

---

[6]  Plaintiff Liszewski states that they "rented a U-Haul truck and moved all supplies by 5:15 p.m."  Dkt. No. 1-7 at 7.  Defendants presented no evidence to the contrary.

[7]  There is some confusion as to whether the protestors were arrested for violating S.C. Code § 10-11-20, which makes it "unlawful to use the State House or grounds for any purpose not authorized by law," or for violating S.C. Code Ann. § 10-11-30, which provides:

It shall be unlawful for any person to trespass upon the grass plots or flower beds of the grounds of the State House or the Governor's mansion, or of the grounds surrounding any of the State office buildings located in the area bounded by Assembly, Gervais, Bull, and Pendleton Streets in the city of Columbia, to damage

personal recognizance bonds by the morning of November 17, 2011.  On December 1, 2011, the Fifth Circuit Solicitor announced that he was dismissing all charges against the protestors.

On November 22, 2011, Plaintiffs – Occupy Columbia, Walid Hakim, Melissa Harmon, Bradley Powell, Timothy Liszewski, David Bland, Ashley Blewer, and David Arroyo (collectively, "Plaintiffs" or "Occupy Columbia") – filed a Complaint in state court and sought temporary relief to enjoin Defendants, including but not limited to South Carolina Governor Nikki Haley, the members of the State Budget and Control Board, and the Director of BPS, from interfering with Plaintiffs' 24-hour occupation of the State House grounds, including sleeping on the State House grounds, and the use of sleeping bags and tents.  On November 23, 2011, a state circuit court judge granted Plaintiffs' motion for a temporary restraining order ("TRO") to restrain "Defendants from preventing the Plaintiffs from being on the grounds of the South Carolina State House (including using sleeping bags and tents) 24 hours a day."[8]  Dkt. No. 1-5 at 1.  The TRO was effective for no more than ten days unless extended by the court.  A hearing on Plaintiffs' motion for preliminary injunction was scheduled for December 1, 2011.  However, on November 30, 2011, Defendants removed the case to federal court.  On December 1, 2011, the parties filed a stipulation agreeing to extend the TRO until 5:00 p.m. on December 15, 2011.  This court scheduled the hearing on Plaintiff's motion for preliminary injunction on December 14, 2011, at 10:30 a.m.

---

or deface any of the buildings, or to cut down, deface, mutilate or otherwise injure any of the statues, trees, shrubs, grasses or flowers on the grounds or commit any other trespass upon any property of the State, real or personal, located thereon.

[8]  After the state court issued the TRO, Plaintiffs began using tents.

6

## STANDARD

This civil rights action under 42 U.S.C. § 1983 seeks injunctive relief[9] for alleged violations of Plaintiffs' First Amendment rights of free speech, peaceable assembly, and petition.[10]  The court considers Plaintiffs' motion for preliminary injunction to enjoin Defendants from interfering with their 24-hour occupation of the State House grounds, including sleeping on the State House grounds, and using sleeping bags and tents, pending final resolution of this case.

A preliminary injunction is "an extraordinary remedy . . . which is to be applied only in [the] limited circumstances which clearly demand it."  *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 811 (4th Cir. 1991) (internal quotation marks omitted) (citation omitted).  The traditional purpose of a preliminary injunction is to "protect the status quo and to prevent irreparable harm during the pendency of a lawsuit ultimately to preserve the court's ability to render a meaningful judgment on the merits."  *In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 525 (4th Cir. 2003).  As held by the Supreme Court and the Fourth Circuit Court of Appeals, to qualify for injunctive relief, a plaintiff must show (1) likelihood he will succeed on the merits; (2) likelihood he will suffer irreparable harm in the absence of a preliminary injunction; (3) that the balance of equities tips in his favor; and (4) that the injunction is in the public interest.  *Winter v. NRDC, Inc.*,

---

[9]    According to their Complaint, "Plaintiffs later intend to amend their complaint and seek damages pursuant to 42 U.S.C. § 1983."  Dkt. 1-1 at 10.

[10]    Plaintiffs' claims are founded on the South Carolina Constitution, the United States Constitution, and South Carolina common law (false imprisonment).  For purposes of this motion, the court need only consider Plaintiffs' claims pursuant to the First Amendment to the United States Constitution.

555 U.S. 7, 20 (2008); *Real Truth About Obama v. FEC*, 575 F.3d 342, 346 (4th Cir. 2009), vacated on other grounds, 558 U.S. __ , 130 S. Ct. 2371 (2010).[11]

The *Winter-Real Truth* standard requires the party seeking the injunction to make a "clear showing" that he is likely to succeed on the merits. *Real Truth*, 575 F.3d at 345; *see also Winter v. NRDC*, at 555 U.S. at 22. This standard compels the moving party to show that he is *likely* to prevail. Regardless of the balance of hardships, it is insufficient for the party to show only that "grave or serious questions are presented" in the litigation. *Compare Real Truth*, 575 F.3d at 346 *with Blackwelder Furniture Co. of Statesville v. Seilig Mfg. Co.*, 550 F.2d 189, 196 (4th Cir. 1977).

Second, the moving party must make a clear showing that he is likely to be irreparably harmed if preliminary relief is denied. To meet this test, the party must show more than a mere *possibility* of harm. *Winter*, 555 U.S. at 21. Third, the moving party must show that the balance of equities tips in his favor. *Id*. at 21, 26. Fourth, the district court must consider whether grant or denial of the injunction is in the public interest. The court must give "particular regard" to the public consequences of granting a preliminary injunction. *Id.* at 24; *Real Truth*, 575 F.3d at 347. The Fourth Circuit no longer recognizes a "flexible interplay" among these criteria. Instead, each

---

[11] In *Real Truth*, the Fourth Circuit modified its prior approach, which required district courts to balance the likelihood of irreparable harm to each party as a "first step" in its analysis, and then to consider the likelihood of success only as a secondary matter, dependent upon the outcome of the initial balance-of-hardships test. *See Blackwelder Furniture Co. of Statesville v. Seilig Mfg. Co.*, 550 F.2d at 195-96. The Supreme Court recently vacated *Real Truth* and remanded the case for further consideration in light of *Citizens United v. Federal Election Comm'n*, 558 U.S. ___, 130 S. Ct. 876 (2010), which related to corporate electioneering communications under the First Amendment. *See Real Truth About Obama, Inc. v. FEC*, 558 U.S. __, 130 S. Ct. 2371 (2010). The Fourth Circuit remanded the First Amendment-related aspects of the case to the district court but reissued, *inter alia*, the portion of the 2009 opinion setting forth the *Winter-Real Truth* preliminary injunction standard. *See Real Truth About Obama, Inc. v. FEC*, 607 F.3d 355 (4th Cir. 2010).

requirement must be fulfilled as articulated.  *Real Truth*, 575 F.3d at 347 (quoting *Blackwelder*, 550 F.2d at 196).

The first factor – likelihood of success on the merits – takes on greater significance "in the context of an alleged violation of First Amendment rights[.]"  *WV Ass'n of Club Owners & Fraternal Servs., Inc. v. Musgrave*, 553 F.3d 292, 298 (4th Cir. 2009) (addressing First Amendment challenge to limitations on advertising).  This is because "a plaintiff's claimed irreparable harm is 'inseparably linked' to the likelihood of success on the merits of [the] First Amendment claim."  *Id. See also Newsom v. Albemarle County Sch. Bd.*, 354 F.3d 249, 254-55 (4th Cir. 2003) (noting that a determination of likelihood of success on the merits as to a First Amendment claim supports a finding of irreparable harm); *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (noting that loss of First Amendment freedoms, even for a short period of time, constitutes an irreparable injury); *Johnson v. Bergland*, 586 F.2d 993, 995 (4th Cir. 1978) ("Violations of [F]irst [A]mendment rights constitute per se irreparable injury.").

### DISCUSSION

The court considers Plaintiffs' state court memorandum filed in support of their motion for TRO and preliminary injunction as Plaintiffs' opening brief.  Plaintiffs argue that there is no law or regulation that prohibits Plaintiffs from occupying the State House grounds 24 hours a day or using sleeping bags and tents on the grounds.  Plaintiffs argue that, pursuant to S.C. Code Ann. § 10-1-30, the Director of General Services may only limit use of the State House grounds in accordance with regulations promulgated by the State Budget and Control Board, and that the Board has not promulgated any regulations restricting the use of the grounds.  Neither has the Board promulgated

an emergency regulation under S.C. Code Ann. § 1-23-130.[12]  Finally, Plaintiffs argue that the

informal policies that purport to restrict the use of the State House grounds are unconstitutional

restrictions on free expression in a public forum.

Defendants filed their briefs in opposition to the motion for preliminary injunction on

December 8, 2011.  Governor Haley, sued as Governor and as Chairwoman of the State Budget and

Control Board, filed a brief and stipulation containing the Governor's "prospective enforcement

policy" ("Stipulation").  The Stipulation provides,

> Governor will not order the arrest of members of Occupy Columbia (including
> Plaintiffs) when on the grounds of the South Carolina State House for violations of
> South Carolina Code § 10-11-20 ("Unauthorized use of State House or grounds") or
> the South Carolina Budget and Control Board's "Conditions for Use of South
> Carolina State House and Grounds" policy unless the members of Occupy Columbia
> (including Plaintiffs) are camping on the State House grounds.

Dkt. No. 17-1.  The Stipulation then defines "camping."

Governor Haley indicates that she has no intention of enforcing the 6:00 p.m. policy against

Occupy Columbia in the future.  Governor Haley explains that she is no longer concerned with the

24-hour occupation, but rather with sleeping and camping on the State House grounds.  She states

that when participants of Occupy Columbia returned to the State House grounds on November 17,

2011, after the arrests, the 6:00 p.m. policy was not enforced because they returned "without

bringing their belongings" and "they did not appear to be re-attempting to convert the State House

grounds into a campsite."  Dkt. No. 17 at 3.  Governor Haley notes that, on November 16, 2011, she

sought "assistance in preventing the plaintiffs and others from living on State House property unless

---

[12]  S.C. Code Ann. § 1-23-130 provides that an agency may file a regulation with the
Legislative Council "[i]f an agency finds that an imminent peril to public health, safety, or welfare
requires immediate promulgation of an emergency regulation."  An emergency regulation becomes
effective as of the time of filing and generally remains in effect for ninety days.  *Id.*

they receive written permission to do so pursuant to the Budget and Control Board's policy entitled 'Conditions of Use of South Carolina State House and Grounds.'"[13] Dkt. No. 17 at 2.

Governor Haley also argues that the Board need not promulgate regulations to restrict use of the State House grounds. She submits that government agencies cannot be expected to promulgate regulations in anticipation of every situation, and that all government agencies rely on internal policies to fulfill their duties.

Defendants Curtis Loftis, Richard Eckstrom, Hugh Leatherman, and Brian White ("Board Defendants") are the four remaining members of the State Budget and Control Board.[14] Board Defendants filed a brief stating that they took no action against Plaintiffs and had no interaction with Plaintiffs prior to November 23, 2011.[15] Board Defendants explain that if the preliminary injunction

---

[13] Governor Haley also contends Plaintiffs were properly "asked to remove their belongings from the grounds after they had squatted on the property for approximately thirty days." Dkt. No. 17 at 5. She cites S.C. Code Ann. § 10-11-20, which provides that it is unlawful "to use the State House grounds for any purpose not authorized by law," and § 10-11-30, which provides that it is unlawful "for any person to trespass upon the grass plots or flower beds of the grounds of the State House." *Id.* Governor Haley, however, acknowledges that the propriety of the arrests of nineteen protestors based on violations of these laws is not before the court at this time. She does not otherwise rely on these statutes as a basis to prohibit Plaintiffs' future conduct. *Id.*

Plaintiffs respond that the State House grounds are open to the public, *see Edwards v. South Carolina*, 372 U.S. 229, 230 (1963), and therefore "the public [has] the implied consent of the owner to enter the premises." Thus, Plaintiffs argue that there can be no trespass on the State House grounds by virtue of being on the property. Plaintiffs acknowledge that the defacing of monuments or destruction of vegetation could be a violation of § 10-11-30, but deny that Occupy members have committed such acts.

[14] Board Defendants explain that Defendants M. Richbourg Roberson and Sterling L. Morrison are no longer employed with the Board and were never served. Dkt. No. 13 at 2 n.1. Defendants Roberson and Morrison, therefore, did not file a response.

[15] Board Defendants explain that Governor Haley's actions towards Plaintiffs on November 16, 2011, were without authorization by the State Budget and Control Board, and were without consultation with any of the individual Board members. Dkt. No. 13 at 5.

is denied, the Board would authorize participants in Occupy Columbia to protest 24 hours a day while this case is pending, provided Occupy Columbia requests authorization, but would not permit participants in Occupy Columbia to live on the State House grounds, including "setting up tents, sleeping or using sleeping bags or bed rolls, or otherwise residing on the State House grounds." Dkt. No. 13 at 10.

Board Defendants argue that, pursuant to S.C. Code Ann. § 10-1-30, the State Budget and Control Board is permitted to pass regulations and impose restrictions regarding use of the State House grounds to ensure the public health, safety, and welfare will be protected. Section 10-1-30 provides,

> The Director of the Division of General Services of the State Budget and Control Board may authorize the use of the State House lobbies, the State House steps and grounds, and other public buildings and grounds in accordance with regulations promulgated by the board. The director shall obtain the approval of the Clerk of the Senate before authorizing any use of the Gressette Building and shall obtain the approval of the Clerk of the House of Representatives before authorizing any use of the Blatt Building. The regulations must contain provisions to insure that the public health, safety, and welfare will be protected in the use of the areas including reasonable time, place, and manner restrictions and application periods before use. If sufficient measures cannot be taken to protect the public health, safety, and welfare, the director shall deny the requested use. Other restrictions may be imposed on the use of the areas as are necessary for the conduct of business in those areas and the maintenance of the dignity, decorum, and aesthetics of the areas.

S.C. Code Ann. § 10-1-30. Although the Board has never passed any regulations relating to the use of the State House grounds, Board Defendants argue that § 10-1-30 allows the Board to create restrictions *or* regulations regarding use of the State House grounds, and that the Board created

restrictions on the use of the State House grounds when it created the document entitled "Conditions."[16]

Board Defendants also argue that camping and sleeping on the State House grounds are not protected expression under the First Amendment. Should the court find that Plaintiffs' camping and sleeping on the State House grounds is expressive conduct protected by the First Amendment, Board Defendants argue that the Conditions impose permissible time, place, and manner restrictions on Plaintiffs' right to camp and sleep on the State House grounds. Dkt. No. 13 at 14-15.

Defendants Leroy Smith, Director of the South Carolina Department of Public Safety; Zachary Wise, Chief of Police of the South Carolina Bureau of Protective Services; James Carr; Joe Hodge; Andrew Schmidt; and M.E. Harris, III ("Law Enforcement Defendants") filed a brief stating that they agreed with Governor Haley's brief. Dkt. No. 14 at 2.[17]

On December 12, 2011, Plaintiffs filed a reply brief. Plaintiffs first argue that Governor Haley acted without authority, and without consultation with the members of the Board, when she issued the 6:00 p.m. policy and ordered the arrests of any members of Occupy Columbia remaining on the State House grounds after 6:00 p.m. Dkt. No. 19 at 1-2. Plaintiffs contend that Governor

---

[16] A bill has been introduced to, inter alia, amend S.C. Code Ann. § 10-1-30 to provide, in relevant part, that "[t]he State Budget and Control Board may authorize the use of the State House steps and grounds and other public buildings and grounds in accordance with *restrictions* set by the board." H.B. 3066, 2011 Gen. Assemb., Reg. Sess. (S.C. 2011) (emphasis added). According to counsel for Plaintiffs and Defendants, this bill has not passed.

[17] Defendants Harvey Peeler and the State of South Carolina each filed separate briefs arguing that the preliminary injunction should not be issued against them. *See* Dkt. Nos. 16, 18. During the hearing on Plaintiffs' motion for preliminary injunction, Plaintiffs informed the court that they had agreed to dismiss the Complaint without prejudice as to the State of South Carolina and Harvey S. Peeler. Defendants had no objection to the dismissal of either party. The court, therefore, dismissed the Complaint as to the State of South Carolina and Mr. Peeler.

Haley has no authority to create rules governing the public use of the State House grounds. *Id.* at 1-3,12. As to the Conditions, Plaintiffs submit that they do not have the force and effect of law because they are not regulations promulgated in accordance with § 10-1-30.[18] Plaintiffs also argue that the Conditions do not comply with an earlier court's directive to develop a licensing process for use of the State House grounds in *Grass Roots Organizing Workshop (GROW) v. Campbell*, 704 F. Supp. 650 (D.S.C. 1989) ("*GROW II*"). *Id.* at 2-3, 5-7. Finally, Plaintiffs urge that the Conditions are not valid time, place, and manner restrictions because they (1) are not applied equally to all individuals or groups, (2) are vague and unpublished, and (3) give unbridled discretion to the Director of General Services. *Id.* at 10-12.

### A. Likelihood of Success on the Merits

The parties do not dispute that Plaintiffs have a First Amendment right to speak and assemble on the State House grounds. However, the parties disagree as to whether Plaintiffs have a First Amendment right to camp and sleep on the State House grounds. The court, therefore, first determines whether Plaintiffs' camping and sleeping on the State House grounds is expression protected under the First Amendment. The court then considers whether Governor Haley's and the State Budget and Control Board's 6:00 p.m and no-camping policies infringe Plaintiffs' First Amendment rights.

**Protected Activity.** Plaintiffs argue that, under *Spence v. Washington*, 418 U.S. 405, 409-11 (1974), camping and sleeping on the State House grounds in connection with their 24-hour occupation is protected speech as symbolic expression. Dkt. No. 19. *See Virginia v. Black*, 538

---

[18]  Plaintiffs argue that these Conditions do not have the force or effect of law under South Carolina's Administrative Procedures Act ("APA"). *See* S.C. Code Ann. § 1-23-10 ("Policy or guidance issued by an agency other than in a regulation does not have the force or effect of law.").

U.S. 343, 360 n.2 (2003) ("[T]he First Amendment protects symbolic conduct as well as pure speech."). In *Spence*, the Supreme Court articulated two factors to examine when determining whether conduct is symbolic expression: (1) whether the actor intends to convey a particularized message, and (2) whether there is a substantial likelihood that the message will be understood by those who view the conduct. 418 U.S. at 409-11.

Plaintiffs argue that they have shown that they intend to convey a particularized message that "a more just, democratic, and economically egalitarian society, responsive to people rather than corporations, is possible." Dkt. No. 19 at 3. According to Plaintiffs, "[t]his social and political message can only be served by a constant and physical 24-hour occupation of the State House grounds, as it symbolically communicates that just as corporations occupy the inside of the State House via campaign contributions, influence, gifts, and lobbyists, Occupy Columbia will occupy the grounds surrounding it." *Id.* at 4. Finally, Plaintiffs argue that "because the State House grounds are 'also the center for demonstrations and protests in South Carolina,' there is a substantial likelihood that this message will be understood by those who see the occupation of the State House grounds." *Id.*

Board Defendants argue that Plaintiffs cannot show that the First Amendment is implicated by Plaintiffs' decision to camp, sleep, and live indefinitely on State House grounds. Dkt. No. 13 at 14. Although Governor Haley argues in her brief that the "First Amendment does not authorize the plaintiffs to camp at the State House," her counsel would not take a position on whether camping can be expressive conduct protected by the First Amendment. Dkt. No. 17 at 5. None of the Defendants attempt to distinguish the conduct of Occupy Columbia from other Occupy cases in which courts have held that camping is expressive conduct. *See infra* p. 17.

15

The Supreme Court has assumed that overnight camping in a public park may constitute expressive conduct and, therefore, may be protected by the First Amendment. *Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 293 (1984).[19]  In that case, demonstrators challenged the United States Park Service's denial of permission to sleep in tents that were erected on the Mall and Lafayette Park in Washington, D.C. as part of a demonstration intended to call attention to the plight of the homeless.  The Interior Department promulgated regulations that permitted camping only in areas designated for camping, and the Mall and LaFayette Park were not designated camping areas. The Court analyzed whether the regulations were reasonable time, place, and manner restrictions and whether the conduct itself may constitutionally be regulated, the regulation was narrowly drawn to further a substantial governmental interest, and the interest was unrelated to the suppression of free speech. *Id.* at 294 (citing *United States v. O'Brien*, 391 U.S. 367 (1968)).  The Court held that the regulation was lawful under *O'Brien* and served as a reasonable time, place, and manner restriction. *Id.* at 298.

Similarly, other courts have recognized that camping or sleeping in a public place, while not otherwise protected by the Constitution, may amount to expressive conduct under certain circumstances. *See Whiting v. Town of Westerly*, 942 F.2d 18, 21 (1st Cir. 1991) (recognizing that "[t]he act of sleeping in a public place, absent expressive content, is not constitutionally-protected conducted");  *State v. Sturch*, 82 Haw. 269, 921 P.2d 1170, 1176 (Haw. Ct. App. 1996) (noting that there is "no authority supporting a specific constitutional right to sleep in a public place" unless it is expressive conduct within the ambit of the First Amendment or is protected by other fundamental

---

[19]  In his dissent in *Clark*, Justice Marshall concluded that "sleeping in a highly public place, outside, in the winter for the purpose of protesting homelessness – is symbolic speech protected by the First Amendment." *Id.* at 301.

rights).  Although most courts addressing this issue have assumed without deciding that camping and sleeping in public areas may be expressive conduct, two district courts have recently held that camping in a city park as part of the Occupy Movement is protected by the First Amendment. *Occupy Fort Myers v. City of Fort Myers*, No. 2:11-cv-00608, 2011 WL 5554034 (M.D. Fla. Nov. 15, 2011) (holding that camping was symbolic conduct because "[t]he conduct of tenting and sleeping in the park 24 hours a day to simulate an 'occupation' is intended to be communicative and in context is reasonably understood by the viewer to be communicative"); *Occupy Minneapolis v. County of Hennepin,* No. 11-3412, 2011 WL 5878359 (D. Minn. Nov. 23, 2011) ("The Court agrees with that well-reasoned conclusion [in Occupy Fort Myers] and, hence, Plaintiffs may challenge the ban on sleeping and erecting structures under the First Amendment.").

As in the case involving Occupy Fort Myers and Occupy Minneapolis, this court finds that Plaintiffs are likely to establish that Occupy Columbia's camping on the State House grounds is expressive conduct, as defined by *Spence*.  Plaintiffs have shown that they intend to communicate a particularized message that is substantially likely to be understood by those who observe their 24-hour occupation, including camping and sleeping, on the State House grounds.  The court, therefore, finds that Plaintiffs are likely to succeed in establishing that their 24-hour occupation of the State House grounds, which involves camping and sleeping, is expressive conduct protected by the First Amendment.

**Restrictions.**  Finding that Plaintiffs' conduct likely is protected expression, the court must consider whether the restrictions on Plaintiffs' conduct are constitutional.  It is well established that

17

government may reasonably restrict expression in public forums, such as the State House grounds.[20] In traditional public forums, government may restrict speech as long as restrictions "are reasonable time, place, and manner restrictions; are content-neutral; and are 'narrowly tailored' to serve a significant governmental interest." *Steinburg v. Chesterfield County Planning Comm'n*, 527 F.3d 377, 384 (4th Cir. 2008) (citing *Clark*, 468 U.S. at 293, 295). "In addition, content-based restrictions may be imposed in a traditional public forum where there is 'a clear and present danger that [the speech] will bring about the substantive evils that [government] has a right to prevent,' . . . and where the restrictions are narrowly drawn to serve that compelling state interest." *Id.* (internal citations omitted). *See also Christian Legal Soc. Chapter of the Univ. of California, Hastings College of the Law v. Martinez*, __ U.S. __, 130 S. Ct. 2971, 2984 (2010) (explaining that content-based restrictions are subject to strict scrutiny).

The court recognizes that the State may properly regulate conduct on the State House grounds, including prohibiting camping and sleeping. In fact, S.C. Code Ann. § 10-1-30 specifically authorizes the State Budget and Control Board to promulgate *regulations* to restrict the use of the State House grounds. Twenty-two years ago, the Board advised a judge of this court that it was enacting regulations pursuant to this statute. *GROW II*, 704 F. Supp. at 652.[21] However, the Board

---

[20]    None of the Defendants directly dispute that the State House grounds are open to the public for speech and have traditionally been used for speech. *See Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 45 (1983) ("In places which by long tradition or by government fiat have been devoted to assembly and debate, the rights of the state to limit expressive activity are sharply circumscribed. At one end of the spectrum are streets and parks which 'have immemorially been held in trust for the use of the public, and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.'"). *See also Edwards,* 372 U.S. at 230.

[21]    The *GROW II* plaintiffs asked an earlier court to set forth the legal requirements the State must satisfy to regulate expression on the State House grounds under § 10-1-30. 704 F. Supp. at

never promulgated any regulations or created reasonable time, place, and manner restrictions establishing a 6:00 p.m. limitation on activities on the State House grounds and certainly none that address camping or sleeping. What does exist is an internal document, the "Conditions."[22] These Conditions serve only as guidelines for a reservation system for events after 6:00 p.m. and do not

---

652. The court explained that the State could promulgate regulations restricting the time, place, and manner of expression on the State House grounds or that the State could create a licensing scheme to allocate the use of the grounds. *Id.* at 653. The court stated that any regulations of time, place, and manner must be content-neutral, narrowly tailored to serve a significant state interest, and leave open ample, alternative channels of communication. *Id.* Further, the court noted that any licensing process created by the State must be content-neutral, and narrowly tailored to serve a legitimate government interest unrelated to the content of the expression. *Id.* The court explained that, as a prior restraint, "any such [licensing] scheme must afford applicants procedural safeguards whereby (1) the State will bear the burden of instituting judicial proceedings, (2) any restraint prior to judicial review is only for a brief specified time and for the purpose of preserving the status quo and (3) a prompt and final judicial determination is assured." *Id.* The court concluded that "[a]ny constitutional regulation of expression on the State House grounds must be effected in accordance with these principles." *Id.*

Plaintiffs argue that *GROW II* required the State of South Carolina to create a licensing scheme if the State chose to regulate the use of the State House grounds. The court does not interpret *GROW II* to require the creation of a licensing scheme to manage the use of the State House grounds. The court interprets *GROW II* as advising the State that it may create a licensing scheme to regulate the use of the State House grounds, but as a prior restraint, the State would need to create procedural safeguards in connection with the licensing scheme. The State, however, was advised that it could promulgate valid time, place, and manner regulations regarding the use of the State House grounds.

[22] The parties disagree as to whether the Conditions are authorized by § 10-1-30 in the absence of regulations, and whether an agency's internal policies have the force or effect of law. The court, however, need not decide whether the Board can restrict use of the State House grounds without promulgating regulations because the only restrictions in this case, as explained below, are not valid time, place, and manner restrictions. Should the Board promulgate regulations pursuant to § 10-1-30, Plaintiffs' argument that the Board is required to promulgate regulations in order to impose time, place, and manner restrictions on protected First Amendment activity on the State House grounds would no longer apply. *See* Dkt. No. 19 at 7-8.

expressly address camping or sleeping.[23]  Consequently, there is no express prohibition on camping or sleeping on the State House grounds in any law, regulation, or written policy.

The Board explains that the Conditions do not restrict camping or sleeping because General Services "has never received a request from any group or individual to set up residence or sleep or camp indefinitely on the State House grounds." Dkt. No. 13 at 9.  Thus, Board Defendants' position is that there was no need for such a Condition.  However, "when the Occupy Columbia participants arrived at the State House grounds, the Division of General Services was observing an unwritten policy – and until that moment, an unnecessary policy – that restricted it from authorizing persons to sleep or camp indefinitely overnight on State House grounds."  *Id.*

Although the court finds that the Conditions do not expressly or implicitly prohibit camping or sleeping, the court considers whether Paragraph 8 of the Conditions, which purports to establish a 6:00 p.m. restriction on events without special provisions in writing, is a valid time, place, and manner restriction.  *See Heffron v. International Soc. for Krishna Consciousness, Inc.*, 452 U.S. 640, 647 (1981) ("It is also common ground, however, that the First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired."). For the reasons below, the court finds that Paragraph 8 of the Conditions is not a valid time, place, and manner restriction.

---

[23]  The Conditions expressly address the need for special provisions in writing for activities scheduled beyond 6:00 p.m. on the State House grounds.  Although the Conditions may prohibit certain activities that could be involved in camping, such as "[n]o wires or stakes may be placed into the ground," no Conditions expressly prohibit camping or sleeping.  In fact, the Conditions contemplate that tents may be used for events. Dkt. No. 1-5 at 29 ("Use of equipment such as tents, tables, chairs, public address systems, etc. on the State House grounds should be coordinated through General Services . . . .").

First, as this document is not accessible on the Internet or otherwise posted or available to the public, the Conditions fail to provide notice to the public of these restrictions to expression on the State House grounds.  According to Board Defendants, any group seeking authorization for an event on the State House grounds would need to inform General Services by either email or letter about the group's intended use.[24]  Dkt. No. 13-1 at 3-4.  After the event was confirmed, General Services would provide the group with the Conditions and would require that the group read and acknowledge the Conditions.  *Id.* at 4.  Based on Board Defendants' explanation, a group would not have access to the Conditions, and would not know it needed to request any authorization to hold an event after 6:00 p.m., until *after* it notified General Services of the planned event.[25]  Even if the Conditions were available to the public, the Conditions do not explain the procedures an applicant must follow to receive "special provisions in writing" to hold an activity after 6:00 p.m.[26]  The court, therefore, finds that there is no notice to the public of the 6:00 p.m. policy on events contained in the Conditions.

Second, there is no evidence that the 6:00 p.m. policy has been applied consistently to all organizations and groups seeking to use the State House grounds.  *See Ashcroft v. American Civil Liberties Union*, 535 U.S. 564, 573 (2002) ("government has no power to restrict expression because of its message, its ideas, its subject matter, or its content").  For example, when Governor Haley

---

[24]  None of the Defendants have cited any law or regulation requiring prior approval for events held on the State House grounds.

[25]  The APA requires that state agencies make all formal and informal procedures available for public inspection, and that failure to do so renders an agency rule, order or decision invalid and ineffective against any person.  *See* S.C. Code Ann. § 1-23-140.  To the extent the Conditions are considered informal procedures, there is no evidence that the Conditions are available for public inspection unless one knows about them and requests a copy.

[26]  There is no evidence of any sign on the State House grounds which explains that events after 6:00 p.m. are not allowed on the State House grounds unless permission is obtained.

sought enforcement of the 6:00 p.m. policy, she only sought enforcement with respect to violators who were participants in Occupy Columbia. Her letter specifically requested that law enforcement remove any member of Occupy Columbia who remained on the State House grounds after 6:00 p.m., and no other groups or individuals who remained after 6:00 p.m. without special provisions in writing. Further, there is evidence that General Services has applied the policy inconsistently, even to Occupy Columbia. Despite remaining on the State House grounds after 6:00 p.m. since October 15, 2011, the policy was not enforced against Occupy Columbia until November 16, 2011.

Third, the Conditions do not provide clear guidance to law enforcement to ensure compliance with the 6:00 p.m. policy. There is nothing within the Conditions to suggest that violation of the 6:00 p.m. policy would constitute trespassing or any other crime. *See Hill v. Colorado*, 530 U.S. 703, 732 (2000) ("A statute can be impermissibly vague for either of two independent reasons. First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits. Second, if it authorizes or even encourages arbitrary and discriminatory enforcement.").

Finally, to the extent the Conditions create an informal licensing or permitting scheme for use of the State House grounds, the Conditions are vague and give unbridled discretion to General Services to suppress speech on the State House grounds. *See City of Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750, 757 (1988) (explaining that lack of standards in licensing scheme allows licensing official to develop post-hoc rationalizations and make "it difficult for courts to determine in any particular case whether the licensor is permitting favorable, and suppressing

22

unfavorable, expression."). For example, the Conditions fail to explain what criteria General Services should use when evaluating requests to hold activities after 6:00 p.m.[27]

The court acknowledges that "[t]he fact that a policy is not committed to writing does not of itself constitute a First Amendment violation." *See Lebron v. National R.R. Passenger Corp.*, 69 F.3d 650, 658 (2d Cir. 1995). However, to survive a First Amendment challenge, time, place, and manner restrictions must be content-neutral, narrowly-tailored to serve a significant government interest, and leave open ample, alternative channels of communication. *See Clark*, 468 U.S. at 294; *GROW II*, 704 F. Supp. at 653. With respect to the unwritten "no-camping or sleeping" policy, the court is not convinced that this policy is content-neutral and is applied equally to all persons and groups on the State House grounds. *See Consolidated Edison Co. of N.Y. v. Public Service Comm'n of N.Y.*, 447 U.S. 530, 536 (1980) (noting that a valid time, place and manner restriction "may not be based upon either the content or subject matter of speech." ). Certainly the no-camping policy, as defined in Governor Haley's Stipulation and the Board Defendants' brief, is not content-neutral because it applies only to Occupy Columbia and provides no notice to other persons or groups who may wish to engage in expressive conduct involving camping or sleeping on the State House grounds. Further, the two written explanations of the unwritten no-camping policy offered to the court contain different definitions of what conduct is prohibited under the no-camping policy. Finally, there is no evidence that this policy has been applied to any person or group in the past. In

---

[27] Board Defendants describe General Services as a entity that takes reservations. Dkt. No. 13 at 9. This description suggests that General Services has no discretion to deny authorization to groups seeking to hold activities on the grounds after 6:00 p.m. so long as the activity does not interfere with a prior reservation for use of the same space.

fact, participants in Occupy Columbia slept on the grounds with sleeping bags and tarps for over 30 days before the State attempted to enforce this policy.

The court finds that Plaintiffs have made a clear showing they are likely to succeed on the merits in challenging the current unwritten policy prohibiting camping and sleeping on the State House grounds.[28] For the reasons stated above concerning the defective Conditions, Plaintiffs have also made a clear showing that they are likely to succeed on the merits in challenging the current policy restricting activities on the State House grounds after 6:00 p.m. without written authorization.

**B. Irreparable Harm**

As explained earlier, "in the context of an alleged violation of First Amendment rights, a plaintiff's claimed irreparable harm is 'inseparably linked' to the likelihood of success on the merits of plaintiff's First Amendment claim." *WV Ass'n of Club Owners,* 553 F.3d at 298. *See also Newsom v. Albemarle County School Bd.*, 354 F.3d 249, 254-55 (4th Cir. 2003); *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (explaining that the loss of First Amendment freedoms, even for a short period of time, constitutes an irreparable injury); *Johnson v. Bergland*, 586 F.2d 993, 995 (4th Cir. 1978) ("Violations of [F]irst [A]mendment rights constitute per se irreparable injury.").

---

[28] In the event Defendants desire to create a rule prohibiting camping and sleeping on the State House grounds, Defendants could promulgate a regulation under § 10-1-30, just as they advised the court they were doing 22 years ago. *See Grow II*, 704 F. Supp. at 652. As the court explained above, the Conditions are deficient as valid time, place, and manner restrictions because they are, among other reasons, not applied consistently to all groups and organizations. Any constitutional challenge to the regulation of conduct that incidentally burdens speech would be analyzed under *United States v. O'Brien*, which requires that a court consider whether (1) the state has the power to regulate the conduct; (2) the regulation advances a substantial or important government interest; (3) the interest is unrelated to suppressing freedom of expression; and (4) the incidental burden on speech is no more than necessary to achieve the interest. 391 U.S. 367 (1968).

Both Governor Haley and the Board Defendants have stated that they plan to enforce a no-camping policy should the injunction be denied.  Although Governor Haley indicates that she has no intention of enforcing the 6:00 p.m. policy against Occupy Columbia in the future, the Board Defendants state that the Board would not enforce the policy if Occupy Columbia seeks authorization to hold an event after 6:00 p.m.  As explained earlier, Plaintiffs should not have to rely on representations that certain State officials will not enforce the 6:00 p.m. policy, especially when those officials are saying different things.  *See City of Lakewood*, 486 U.S. at 770 (declining to accept City's representation that  "mayor will act in good faith and adhere to standards absent from the ordinance's face" and refusing to "write nonbinding limits into a silent state statute"); *Occupy Fort Myers*, 2011 WL 5554034 at *10 (rejecting Fort Myers' argument that its representation that it would not enforce an ordinance rendered the challenge moot).

Many of the Plaintiffs have stated that they "want to be more involved in Occupy Columbia, but . . . do not desire financial burden, inconvenience, or unlawful detention for engaging in further occupation of the State House grounds."  *See, e.g.*, Dkt. Nos. 1-5 at 23 (Harmon Affidavit); 1-5 at 36 (Powell Affidavit); 1-6 at 20 (Bland Affidavit).  Plaintiffs argue that they "are suffering an irreparable harm right now" as a result of the "enforcement of non-existent rules" and the threat of arbitrary and capricious action against them as a result of new rules that "may be created and enforced on the spot." Dkt. No. 1-5 at 11.  The fear of inconsistent application of the policies creates a risk that Plaintiffs will be silenced in violation of the First Amendment.  The court, therefore, finds that Plaintiffs have established an irreparable injury.

## C. Balance of the Equities

Board Defendants argue that the Board has a duty to "keep, landscape, cultivate and beautify the State House and State House grounds." S.C. Code Ann. § 10-1-10. They argue that if the court grants Plaintiffs' motion for preliminary injunction, "there would be nothing to stop other groups from setting up their own 'encampments,'" and that "[a]llowing the State House to become a campground is also not consistent with the Board's charge to maintain the 'dignity, decorum, and aesthetics' of the State House grounds." Dkt. No. 13 at 11 n.4. By granting Plaintiffs' preliminary injunction, the court is not "[a]llowing the State House to become a campground." The court is merely enjoining Defendants from making up rules that do not comport with the First Amendment as a knee-jerk response to Plaintiffs' occupation.

The State Budget and Control Board, not the court, has the ability to remedy this situation and may promulgate regulations governing use of the State House grounds under S.C. Code Ann. § 10-1-30. The Board has had this authority for over 22 years.

On the other hand, Plaintiffs have little remedy should their First Amendment rights be violated as a result of inconsistently applied and ever-changing policies regarding use of the State House grounds. The balance, therefore, tips in Plaintiffs' favor.

## D. Public Interest

Defendants argue that Plaintiffs' encampment is having an adverse impact on the State House grounds. Dkt. No. 13 at 10-11. Defendants suggest that there has been damage to the grass and the flower and shrubbery beds. *Id.* at 11. Defendants also cite a concern that an increase in tents may impede pedestrian traffic on the State House grounds, as well as "public safety" concerns regarding sanitation, feeding of wildlife, and security. *Id.* at 11-12. The court finds that the public

26

has an interest in having a properly-maintained State House grounds that may be enjoyed by everyone, including those not involved with Occupy Columbia, and that the Occupy Columbia encampment is causing at least some damage to the State House grounds.

However, the court also finds that the public has an interest in access to the State House grounds, including for the purpose of protesting. This interest, protected by the First Amendment, can only be limited by reasonable time, place, and manner restrictions. Because there are none, the public interest in the rights of its citizens under the First Amendment prevails.

## CONCLUSION

It is for the above reasons that the court entered the Order of December 14, 2011 granting Plaintiffs' motion for preliminary injunction (Dkt. No. 27).


S/ Cameron McGowan Currie
CAMERON MCGOWAN CURRIE
UNITED STATES DISTRICT JUDGE

Columbia, South Carolina
December 16, 2011

27